2015-1277

# United States Court of Appeals
# for the Federal Circuit

TRADING TECHNOLOGIES INTERNATIONAL, INC.,

*Plaintiff-Appellee,*

v.

CQG, INC. and CQGT, LLC,

*Defendants-Appellants.*

Appeal from the United States District Court for the Northern District of Illinois in case no. 05-CV-4811, Judge Sharon Johnson Coleman.

## OPENING BRIEF FOR DEFENDANTS-APPELLANTS CQG, INC. AND CQGT, LLC.

Adam G. Kelly
William J. Voller
LOEB & LOEB LLP
321 North Clark Street, Suite 2300
Chicago, IL 60654
(312) 464-3100

Laura A. Wytsma
LOEB & LOEB LLP
10100 Santa Monica Boulevard
Los Angeles, California 90067
(310) 282-2000

February 19, 2015

Gregory G. Garre
Gabriel K. Bell
Michael E. Bern
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2207

*Counsel for Defendants-Appellants*
*CQG, Inc. and CQGT, LLC*

# CERTIFICATE OF INTEREST

Counsel for Appellants certifies the following:

1. The full name of every party or amicus curiae represented by me is:

    CQG, Inc. and CQGT, LLC.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

    CQG, Inc. and CQGT, LLC are the real parties in interest.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

    CQG, Inc. has no parent corporation or other company that holds 10% or more of its stock.

    CQGT, LLC's parent corporation is CQG, Inc. and no publicly held corporation owns 10% or more of CQGT, LLC's stock.

4. The names of all law firms and the partners or associates that appeared for the party or amicus curiae now represented by me in the trial court or agency or are expected to appear in this court are:

    **Latham & Watkins LLP:** Gregory G. Garre, Gabriel K. Bell, Michael E. Bern.

    **Loeb & Loeb LLP:** Adam G. Kelly, Laura A. Wytsma, William J. Kramer, William J. Voller III, Christopher M. Swickhamer, Melaina D. Jobs, John A. Cotiguala.

Dated:  February 19, 2015

Respectfully submitted,

/s/ Gregory G. Garre
Gregory G. Garre
LATHAM & WATKINS LLP
555 11th Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2207

*Counsel for Appellants*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ......................................................................i

TABLE OF AUTHORITIES ..........................................................................v

STATEMENT OF RELATED CASES ...........................................................1

JURISDICTIONAL STATEMENT ...............................................................1

STATEMENT OF THE ISSUES.....................................................................1

INTRODUCTION ..........................................................................................2

STATEMENT OF THE CASE........................................................................4

     A.     Statutory Background.........................................................................4

     B.     Factual Background............................................................................7

     C.     Procedural History.............................................................................9

           1.     Filing Of This Action And TT's Own Stay Request .................9

           2.     The District Court Sets A Trial Date But Subsequently
                    Equivocates On Whether That Date Will Actually Hold .........10

           3.     CQG Again Alerts The Court To TD Ameritrade's
                    Petition for CBM Review And Suggests Moving The
                    Trial Date ................................................................................11

           4.     PTO Determines That The '132 Patent Is Likely Invalid.........11

           5.     The District Court Denies CQG's Prompt Motion For A
                      Stay In Light Of The PTO's Decision To Institute CBM
                      Review......................................................................................13

           6.     Initial Proceedings In This Court.............................................15

SUMMARY OF ARGUMENT ......................................................................15

ARGUMENT ...............................................................................................21

I.     THE STANDARD OF REVIEW IS *DE NOVO* ...........................................21

**Page**

II.  THE DISTRICT COURT'S CONSIDERATION OF THE AIA STAY FACTORS WAS FUNDAMENTALLY FlAWED ......................................24

    A.  The District Court Erred In Concluding That The First Factor Weighs Against A Stay ......................................................24

    B.  The District Court Erred In Concluding That The Second Factor Weighs Against A Stay ......................................................30

    C.  The District Court Erred In Concluding That The Third Factor Weighs Against A Stay ......................................................37

        1.  The district court's analysis of "undue prejudice" is flawed......................................................37

        2.  The district court's analysis of "clear tactical error" is flawed......................................................41

    D.  The District Court Erred In  Finding That The Fourth Factor Is "Neutral"......................................................45

III.  THIS CASE DOES NOT PRESENT THE SORT OF "EXCEPTIONAL AND EXTREMELY RARE CIRCUMSTANCES" THAT COULD JUSTIFY THE DENIAL OF A STAY ..............................47

CONCLUSION ......................................................50

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Alice Corp. Pty. Ltd. v. CLS Bank International*,
134 S. Ct. 2347 (2014)...................................................................9, 44

*Autoalert, Inc. v. Dominion Dealer Solutions, LLC*,
No. SACV 12-1661-JST 2013 U.S. Dist. LEXIS 171890 (C.D.
Cal. May 22, 2013) .............................................................................39

*Benefit Funding Systems LLC v. Advance America Cash Advance
Centers Inc.*,
767 F.3d 1383 (Fed. Cir. 2014) .....................................................6, 21

*Bilski v. Kappos*,
561 U.S. 593 (2010)...............................................................................2

*Broadcast Innovation, L.L.C. v. Charter Communications, Inc.*,
No. 03-cv-2223-ABJ-BNB, 2006 U.S. Dist. LEXIS 46623 (D.
Colo. July 11, 2006)......................................................................34, 42

*Destination Maternity Corp. v. Target Corp.*,
12 F. Supp. 3d 762, 768 (E.D. Pa. 2014)............................................40

*Fresenius USA, Inc. v. Baxter International, Inc.*,
721 F.3d 1330 (Fed. Cir. 2013) ..........................................................49

*LMT Mercer Group, Inc. v. Maine Ornamental, LLC*,
No. 10-4615 (FLW), 2011 U.S. Dist. LEXIS 55549 (D.N.J. May
24, 2011) ..............................................................................................39

*Market-Alerts Pty. Ltd. v. Bloomberg Finance L.P.*,
922 F. Supp. 2d 486 (D. Del. 2013)....................................................40

*Mayo Collaborative Services v. Prometheus Laboratories, Inc.*,
132 S. Ct. 1289 (2012).........................................................................44

*Neste Oil Oyj v. Dynamic Fuels, LLC*,
No. 12-1744-GMS, 2013 U.S. Dist. LEXIS 92416 (D. Del. July 2,
2013) ....................................................................................................40

**Page(s)**

*Nippon Steel & Sumito Metal Corp. v. POSCO & POSCO America Corp.*,
No. 12-2429 (DMC), 2013 U.S. Dist. LEXIS 62710 (D.N.J. May 2, 2013) ...................................................................................28

*Ornelas v. United States*,
517 U.S. 690 (1996)...............................................................16, 22

*Patlex Corp. v. Mossinghoff*,
758 F.2d 594 (Fed. Cir. 1985) ...............................................5

*Rice v. Nova Biomedical Corp.*,
38 F.3d 909 (7th Cir. 1994) ..............................................21

*Sightsound Technologies, LLC v. Apple, Inc.*,
No. 11–1292, 2013 WL 2457284 (W.D. Pa. June 6, 2013) ...............................46

*Stockton East Water District v. United States*,
761 F.3d 1344 (Fed. Cir. 2014) ......................................33

*Studer Professional Audio GmbH v. Calrec Audio Ltd.*,
No. 2:12-cv-02278 (WHW), 2012 U.S. Dist. LEXIS 104105 (D.N.J. July 25, 2012)...............................................39

*Target Therapeutics, Inc. v. SciMed Life Systems, Inc.*,
No. 4:96-cv-02837-DLJ, 1995 U.S. Dist. LEXIS 22517 (N.D. Cal. Jan. 13, 1995)...............................................46

*Thompson v. Keohane*,
516 U.S. 99 (1995)...............................................................22

*Trading Technologies International, Inc. v. eSpeed, Inc.*,
595 F.3d 1340 (Fed. Cir. 2010) ................................8, 9, 27

*Ultramercial, Inc. v. Hulu, LLC*,
772 F.3d 709 (Fed. Cir. 2014) ......................................30

*United States v. Arvizu*,
534 U.S. 266 (2002)...............................................................22

*Versata Software, Inc. v. Callidus Software, Inc.*,
771 F.3d 1368 (Fed. Cir. 2014) ...............................*passim*

**Page(s)**

*Versata Software, Inc. v. Dorado Software, Inc.*,
    No. 2:13-cv-00920-MCE-DAD, 2014 U.S. Dist. LEXIS 42509,
    2014 WL 1330652 (E.D. Cal. Mar. 27, 2014) ...................................25

*Versata Software, Inc. v. Volusion, Inc.*,
    No. A-12-CA-893-SS, 2013 U.S. Dist. LEXIS 182842, 2013 WL
    6912688 (W.D. Tex. June 20, 2013) .................................................26

*VirtualAgility Inc. v. Salesforce.com*,
    759 F.3d 1307 (Fed. Cir. 2014) ...............................................*passim*

*Xilidev, Inc. v. Boku, Inc.*,
    No. 13cv2795 DMS (NLS), 2014 U.S. Dist. LEXIS 157586 (S.D.
    Cal. July 1, 2014).............................................................................27

*Zillow, Inc. v. Trulia, Inc.*,
    No. C12-1549 JLR, 2013 U.S. Dist. LEXIS 144919 (W.D. Wash.
    Oct. 7, 2013) .............................................................................34, 39

## STATUTES AND RULES

28 U.S.C. § 1331 ....................................................................................1

28 U.S.C. § 1338(a) ...............................................................................1

35 U.S.C. § 101 ............................................................................*passim*

35 U.S.C. § 112 ....................................................................................13

35 U.S.C. § 328(b) ...............................................................................30

Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA") .........................*passim*

Fed. Cir. R. 47.5 .....................................................................................1

## OTHER AUTHORITIES

157 Cong. Rec. E1183 (daily ed. June 22, 2011) ....................................4

157 Cong. Rec. S1361 (daily ed. Mar. 8, 2011) .......................................4

157 Cong. Rec. S1363 (daily ed. Mar. 8, 2011) ..............................*passim*

**Page(s)**

157 Cong. Rec. S1364 (daily ed. Mar. 8, 2011) ...............................................*passim*

157 Cong. Rec. S1379 (daily ed. Mar. 8, 2011) ...............................................*passim*

157 Cong. Rec. S1380 (daily ed. Mar. 8, 2011) ......................................................48

77 Fed. Reg. 48,734 (Aug. 14, 2012).........................................................................4

H.R. Rep. No. 112-98 (2011).....................................................................................5

Megan M. La Belle & Heidi Mandanis Schooner, *Big Banks and Business Method Patents*, 16 U. Pa. J. Bus. L. 431 (2014) ................................44

U.S. Patent & Trademark Office, AIA Statistics, *available at* http://www.uspto.gov/patent/laws-and-regulations/america-invents-act-aia/aia-statistics (last visited Feb. 19, 2015)....................................44

## STATEMENT OF RELATED CASES

CQG, Inc. and CQGT, LLC (together "CQG") are unaware of any related cases within the meaning of Fed. Cir. R. 47.5.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over this patent infringement action under 28 U.S.C. §§ 1331 and 1338(a). This Court's jurisdiction arises from Section 18(b)(2) of the Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284, 331 (2011), which authorizes interlocutory appeals from a district court's decision whether to stay a civil action alleging infringement of a patent, pending review of that patent's validity by the United States Patent and Trademark Office ("PTO").

## STATEMENT OF THE ISSUES

Whether the district court erred by failing to grant a stay of proceedings under the statutory mandate of section 18(b)(1) of the Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA"), where, among other things, the movant promptly sought a stay after the PTO instituted covered business method review of one of the two closely-related patents-at-issue; the sole remaining, related patent is subject to a separate, pending petition for CBM review; the district court itself acknowledged that there was "significant work" to be done on this case at the time of the stay request; and the party opposing a stay has previously sought or agreed to stays in this case totaling some five years?

## INTRODUCTION

Following the Supreme Court's decision in *Bilski v. Kappos*, 561 U.S. 593 (2010), Congress recognized that "a large number of business-method patents" issued over the prior decade "are no longer valid."  157 Cong. Rec. S1379 (daily ed. Mar. 8, 2011) (statement of Sen. Jon Kyl).  To address that problem, Congress enacted the Schumer-Kyl amendment to the AIA in 2011.  That amendment allows parties sued for infringement of covered business method patents to obtain the PTO's expert review of whether such patents are valid "instead of, rather than in addition to, civil litigation."  157 Cong. Rec. S1363 (daily ed. Mar. 8, 2011) (statement of Sen. Charles Schumer).  And to effectuate that right, Congress not only provided parties with the right to seek a stay of proceedings in district court pending resolution of the PTO's review, AIA § 18(b)(1), but also "expected that, if a proceeding against a business method patent is instituted, the district court would institute a stay of litigation unless there were an *extraordinary and extremely rare set of circumstances*."  157 Cong. Rec. S1364 (daily ed. Mar. 8, 2011) (statement of Sen. Schumer) (emphasis added).

Despite the "congressional policy strongly favoring stays when proceedings are instituted under this section," *id.* at S1379 (statement of Sen. Kyl), the district court declined to enter a stay of proceedings in this case after the PTO instituted review of one of the two closely-related business method patents-at-issue, which

the PTO found to be "more likely than not" invalid. Although the district court acknowledged that there remained "significant work to do in this case" at the time the stay was sought and that resolution of the PTO's review process could spare "the Court and the parties . . . costly litigation," A6, the court nonetheless denied CQG a stay, forcing the court and parties to rush to trial without the benefit of the PTO's final determination.

The district court's decision to deny a stay is sharply at odds with Congress' statutory scheme and directly contravenes this Court's own precedent interpreting the statutory stay factors under the AIA. Anticipating precisely this scenario, Congress granted parties an "immediate interlocutory appeal" from a decision whether to grant a stay pending PTO review and provided that this Court "shall review the district court's decision to ensure consistent application of established precedent, and such review may be *de novo*." AIA § 18(b)(2). Since July, this Court has twice reversed district court decisions declining to enter a stay. *See Versata Software, Inc. v. Callidus Software, Inc.*, 771 F.3d 1368 (Fed. Cir. 2014); *VirtualAgility Inc. v. Salesforce.com*, 759 F.3d 1307 (Fed. Cir. 2014). Because the decision below repeats many of those same errors (in addition to making others), this Court should reverse to "ensure consistent application of [this Court's] established precedent" (AIA § 18(b)(2)) and give effect to the unmistakable congressional intent calling for stays pending PTO review.

3

## STATEMENT OF THE CASE

### A.     Statutory Background

In September 2011, Congress enacted the AIA in order "to establish a more efficient and streamlined patent system that will improve patent quality and limit unnecessary and counterproductive litigation costs." 77 Fed. Reg. 48,734, 48,734 (Aug. 14, 2012); *see also* 157 Cong. Rec. S1361 (daily ed. Mar. 8, 2011) (statement of Sen. Patrick Leahy) (same). Section 18 of the AIA, the Schumer-Kyl amendment, created a new PTO administrative proceeding in which a party accused of infringing a business-method patent can challenge the patent's validity. "[T]he proceeding allows business method patents to be reviewed by the experts at the Patent Office under the correct (*Bilski*) standard" and "provide[s] a cheaper, faster alternative to district court litigation over the validity of business-method patents." 157 Cong. Rec. E1183 (daily ed. June 22, 2011) (statement of Rep. Lamar Smith); *id.* at S1363 (daily ed. Mar. 8, 2011) (statement of Sen. Schumer). "To that end, the amendment expressly authorizes a stay of litigation in relation to [district court] proceedings and places a very heavy thumb on the scale in favor of a stay being granted." *Id.* at S1363 (daily ed. Mar. 8, 2011) (statement of Sen. Schumer).

By providing that the "[PTO review] program should be used instead of, rather than in addition to, civil litigation," *id.*, Congress expected the PTO to

employ its expertise to review business method patents in the first instance. Congress recognized that "business method patents … are generally of dubious quality because unlike other types of patents, they have not been thoroughly reviewed at the PTO." *Id.* at S1364; *see also* H.R. Rep. No. 112-98 at 56 (2011) (noting that "the issuance of poor business-method patents during the late 1990's through the early 2000's" stemmed in important part from the fact that "the USPTO lacked a sufficient number of examiners with expertise in the relevant art area").

Section 18 addressed that shortcoming by providing, "[i]n contrast to the era of the late 1990's-early 2000's," a fresh opportunity for "examiners [to] review the best prior art available," consider important developments in the caselaw, and use their expertise to determine "the validity of any business method patent." *Id.* That accords with Congress' longstanding purpose in enabling mechanisms for patent reexamination. *See, e.g.*, *Patlex Corp. v. Mossinghoff*, 758 F.2d 594, 602 (Fed. Cir. 1985) (citation omitted) (Congress enacted patent reexamination procedure "to refer patent validity questions to the expertise of the Patent Office" in order to deliver "'an aid to the trial court 'in making an informed decision on the patent's validity,'" and to "afford[] the PTO a broader opportunity to review 'doubtful patents.'").

5

Congress provided that courts shall decide whether to enter a stay pending PTO review based on:

> (A) whether a stay, or the denial thereof, will simplify the issues in question and streamline the trial; (B) whether discovery is complete and whether a trial date has been set; (C) whether a stay, or the denial thereof, would unduly prejudice the nonmoving party or present a clear tactical advantage for the moving party; and (D) whether a stay, or the denial thereof, will reduce the burden of litigation on the parties and on the court.

AIA § 18(b)(1).  The legislative record shows that "[i]t is congressional intent that a stay should only be denied in extremely rare instances."  157 Cong. Rec. S1363 (daily ed. Mar. 8, 2011) (statement of Sen. Schumer).  In particular, "it is expected that, if a proceeding against a business method patent is instituted, the district court would institute a stay of litigation unless there were an extraordinary and extremely rare set of circumstances not contemplated in any of the existing case law related to stays pending reexamination."  *Id.* at S1364; *see also id.* at S1379 (statement of Sen. Kyl) ("It is expected that district judges will liberally grant stays of litigation once a proceeding is instituted."); *id.* (noting "congressional policy strongly favoring stays when proceedings are instituted under this section").

Congress also granted parties the right to take an immediate interlocutory appeal from a district court's decision on whether to stay a case.  AIA § 18(b)(2). Prior to the AIA, this Court had reviewed district court decisions on motions to stay pending PTO proceedings under the abuse-of-discretion standard.  *See Benefit*

*Funding Systems LLC v. Advance Am. Cash Advance Ctrs. Inc.*, 767 F.3d 1383, 1385 (Fed. Cir. 2014). But Congress provided in the AIA that this Court "shall review the district court's decision to ensure consistent application of established precedent, and such review may be *de novo*." AIA § 18(b)(2). Congress altered the standard "to ensure consistent application of established precedent." 157 Cong. Rec. S1379 (daily ed. Mar. 8, 2011) (statement of Sen. Kyl); *see also id*. at S1364 (statement of Sen. Schumer) (the Federal Circuit "will help ensure that requests to stay are consistently applied across cases and across the various district courts").

To that end, the legislative record shows that Congress "expected that the Federal Circuit will review the district court's decision regarding a stay *de novo*, unless there are unique circumstances militating against a *de novo* review, such as subsequent requests for an interlocutory appeal in the same case." 157 Cong. Rec. S1364 (daily ed. Mar. 8, 2011) (statement of Sen. Schumer); *see also id*. at S1379 (statement of Sen. Kyl) ("[T]he court of appeals cannot simply leave the stay decision to the discretion of the district court and allow different outcomes based on the predilections of different trial judges.").

## B.    Factual Background

Since 2005, Trading Technologies, Inc. ("TT") has filed nearly thirty different lawsuits against various defendants in the Northern District of Illinois, alleging infringement of one or more closely related patents, including the two

7

patents-at-issue here: U.S. Patents Nos. 6,772,132 ('132 patent) and 6,766,304 ('304 patent). As this Court explained in a separate appeal pertaining to the '132 and '304 patents, both "patents claim software for displaying the market for a commodity traded in an electronic exchange." *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1345 (Fed. Cir. 2010). Each patent claims priority to the same provisional application; the '304 patent is a divisional of the '132 patent. *See id.*

As this Court has recognized, "[t]he specifications of the patents are, for all relevant purposes, identical." *Id.* The illustrative claims recited by both patents are very closely related. *Compare* A38 (12:2-27) [illustrative claim 1] ("A method of placing a trade order for a commodity on an electronic exchange having an inside market with a highest bid price and a lowest ask price, using a graphical user interface"), *with* A21-22 (12:36-13:3) [illustrative claim 1] ("A method for . . . facilitating trading of a commodity being traded in an electronic exchange having an inside market with a highest bid price and a lowest ask price on a graphical user interface."). Likewise, both claims recite nearly identical steps: displaying market information as indicators in bid and ask regions along a price axis, updating the market information in response to changes in the market, and placing an order by clicking on some portion of the information.[1] In addition, both patents use only a

---

[1]    *Compare* A38 (describing method comprising "a dynamic display of a plurality of bids and a plurality of asks in the market . . . the dynamic display being aligned

display, a user input device, and a GUI to perform the claimed method steps.  *See* A38 (12:2-27); A21-22 (12:36-13:3).

## C.    Procedural History

### 1.    Filing Of This Action And TT's Own Stay Request

In August 2005, TT sued CQG for alleged infringement of the '132 and '304 patents.  CQG has long defended on the ground that, among other things, the '132 and '304 patents are drawn to ineligible subject matter under 35 U.S.C. § 101.  Because both patents envision nothing more than displaying and updating basic market information and then sending trade orders based on that information using a conventional graphical user interface, the subject matter of both patents relates to implementing an abstract idea on a conventional computer—something that is not eligible for patent protection under § 101.  *See, e.g., Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2352 (2014).

After limited discovery, in 2008, TT proposed a stay in this case pending an appeal in a related case involving the '132 and '304 patents, *eSpeed, Inc.*, 595 F.3d

---

with a static display of prices corresponding thereto . . . and selecting a particular area in the order entry region through single action of the user input device with a pointer of the user input device . . . to set a plurality of additional parameters for the trade order and send the trade order to the electronic exchange), *with* A21 (describing method of "dynamically displaying [indicators of bids and asks], displaying the bid and ask display regions in relation to fixed price levels positioned along the common static price axis . . . [and] in response to a selection of a particular location of the order entry region by a single action of a user input device, setting a plurality of parameters for a trade order relating to the commodity and sending the trade order to the electronic exchange").

1340. *See* A5. Following the *eSpeed* decision in February 2010, the district court stayed the case for a second time after the parties entered into magistrate-supervised settlement discussions. After settlement efforts failed, the district court lifted the stay in May 2012. A100001.

### 2. The District Court Sets A Trial Date But Subsequently Equivocates On Whether That Date Will Actually Hold

In December 2013, the district court set trial for February 23, 2015. A100002. In May 2014, TD Ameritrade, another company sued by TT for infringement of the '132 and '304 patents (among other related patents), filed petitions at the PTO seeking CBM review of five related patents. CQG immediately informed the court about the pending petitions and argued that the PTO's review "underscore[d] [the court's] concern about the February '15 trial date." A200006-07 (7:19-8:13). During that same proceeding, the court expressed concern about "how convoluted this litigation has gotten" and remarked that "where [the parties] are going with this is not [trial in] February 2015, you're going to February 2016." *Id.* at 4:22-5:4. As a result, the court encouraged both parties "to start looking at an adjustment of the trial date because [the court] cannot do it in the time period that we have set aside." *Id.* at 6:2-4. The court suggested that it would consider "moving other cases that are set" for "September [or] October of 2015" if further delay was necessary. *Id.* at 16:11-21.

### 3.     CQG Again Alerts The Court To TD Ameritrade's Petition for CBM Review And Suggests Moving The Trial Date

In July 2014, CQG again advised the court about TD Ameritrade's pending petitions and suggested moving the trial date to await the conclusion of that process.  Although the district court agreed that CQG's position was "not . . . unreasonable," it declined to move the trial date at that time.  A200037-39.  But the district court suggested that it would monitor developments in the CBM review process.  *Id.*  In addition, the court "put an asterisk by this particular trial date so when we get to that point, *if we need to move it, the Court will move it.*"  *Id.* at 11:24-25 (emphasis added); *see id.* at 12:7-10 (stating that the court would look at its calendar for other possible trial dates).

### 4.     PTO Determines That The '132 Patent Is Likely Invalid

On December 2, 2014, the PTO concluded, in response to TD Ameritrade's petition, that "it is more likely than not that the challenged claims [of the '132 patent] are unpatentable under 35 U.S.C. § 101."  Decl. of Adam G. Kelly in Support of Mot. to Stay Pending Appeal ("Kelly Decl."), Ex. 9 at 2, ECF No. 5-7.  As such, the PTO then instituted a CBM review of the '132 patent, as envisioned by Section 18 of the AIA.  The PTO explained that claim 1, which it found illustrative of the challenged claims, "is directed to the abstract idea of placing an order based on observed market information, as well as updating the market information."  Kelly Decl., Ex. 9 at 14, ECF No. 5-7.  Because claim 1 envisions

"nothing more than [using] a conventional, generic computer" (i.e. "a display, an input device, and a GUI") to perform the claimed steps of "receiving market information; displaying the information as indicators in bid and ask regions along a price axis; updating the market information in response to changes in the market; and placing an order by clicking on some portion of the information," the PTO concluded that "claim 1 does no more than simply instruct the practitioner to implement [an] abstract idea on a GUI." *Id.* at 15.[2]

The PTO also instituted review of three of the four additional related patents challenged by TD Ameritrade, concluding that they too were "more likely than not invalid." *See* Kelly Decl., Exs. 10-12, ECF Nos. 5-8 – 5-10. The PTO elected not to institute review of the '304 patent, after concluding that TD Ameritrade's conclusory argument, only two paragraphs long, "provide[d] insufficient analysis." Kelly Decl., Ex. 13 at 13-14, ECF No. 5-11.

CQG subsequently filed its own petitions for CBM review of the '132 and '304 patents, remedying the pleading deficiencies that the PTO identified in TD

---

[2]   TT filed a request for rehearing of the PTO's decision to institute review of the '132 patent.  On February 2, 2015, the PTO denied rehearing, reaffirming that illustrative claim 1 of the '132 patent is only "a method of displaying market information relating to and facilitating trading of a commodity being traded on an electronic exchange" using "a display and an input device, which both were known technology."  Decision on Request for Rehearing at 6, *TD Ameritrade Holding Corp. v. Trading Techs. Int'l, Inc.*, Case CBM2014-00133, Paper 29 (P.T.A.B. Feb. 2, 2015).  As a result, the PTO concluded again that "claim 1 does not recite a technological feature that is novel and unobvious over the prior art."  *Id.* at 7-8.

Ameritrade's petition. In contrast to the "insufficient analysis" in TD Ameritrade's petition, CQG presented a comprehensive twenty-page analysis explaining why the '304 patent—like its closely-related cousins—is invalid under 35 U.S.C. § 101. *See* A100786-805. Moreover, CQG raised additional bases in its petition that separately warrant further CBM review of the '132 patent.

### 5.    The District Court Denies CQG's Prompt Motion For A Stay In Light Of The PTO's Decision To Institute CBM Review

On December 12, 2014, roughly two and a half months before the scheduled trial date, CQG moved the district court to stay proceedings pending the PTO's final determination of whether the '132 patent is invalid. A100003-18. CQG sought a stay not only to avoid the expense of a trial that could be rendered unnecessary if the PTO determines the patents-at-issue are invalid, but also to ensure that the district court could benefit from the PTO's expertise and to avoid the prospect of inconsistent judgments.

At the point CQG sought a stay, significant work remained to be done before the trial, including:

- CQG's motion for summary judgment on willfulness and enhanced damages filed in March 2014 remained pending and TT had not filed its response, or indicated when it would do so;

- CQG's motion for summary judgment of noninfringement filed in March 2014 remained pending;

- CQG's motion for summary judgment of invalidity under 35 U.S.C. § 112 filed in March 2014 remained pending;

13

- CQG had not served four rebuttal expert reports regarding damages, futures trading, patent law, and noninfringement;

- The parties still needed to schedule and take nine expert depositions and two fact depositions, including a third-party deposition in Bermuda;

- The parties had not designated the 140-plus transcripts of depositions taken in this action and in *eSpeed*; and

- The parties had not prepared motions in limine or any other of the extensive pretrial documents required for a jury trial.

Despite its prior stated willingness to move the trial date, the district court denied CQG's motion for a stay even though the PTO actually now had *instituted* CBM review of the '132 patent, finding it "more likely than not" invalid. Although Congress "expected that, if a proceeding against a business method patent is instituted, the district court would institute a stay of litigation unless there were an extraordinary and rare set of circumstances," 157 Cong. Rec. S1364 (daily ed. Mar. 8, 2011) (statement of Sen. Schumer), the district court found that three of the AIA stay factors weighed against a stay and one factor was neutral.

First, the district court concluded that a stay would not simplify the issues or streamline the trial because the PTO instituted CBM review only for *one* of two challenged patents and because it believed "there are other issues relating to the '132 patent that the Court would still have to resolve" even if the PTO found the '132 patent invalid. A3-4. Second, the court found that the stage of litigation weighed against a stay. Although it "acknowledge[d] that there remains significant

14

work to be done on this case," the court found dispositive that "the bulk of discovery, dispositive motions, *Daubert* motions, and claim construction is complete." *Id.* at 4-5.  Third, the court found that awaiting resolution of the CBM review process would risk "potential prejudice to TT," even though TT itself previously sought or agreed to stays lasting years.  *Id.* at 6.  And although CQG immediately notified the court after TD Ameritrade filed its petition and again after the PTO granted it, the court stated CQG's actions suggested a "possible … dilatory motive."  *Id.*  Finally, the district court concluded the "burden of litigation" factor was "neutral" because "[i]f the USPTO invalidates the patents, *only then* will the Court and parties be spared the costly litigation."  *Id.* (emphasis added).

### 6.    Initial Proceedings In This Court

Immediately after this appeal was docketed, CQG filed a motion for a temporary stay pending appeal to this Court.  This Court requested a response.  On February 4, 2015, a panel of this Court denied CQG's stay motion "[w]ithout prejudicing the ultimate disposition of this case by a merits panel."  Order at 2. This Court subsequently denied CQG's motion to expedite the appeal.

### SUMMARY OF ARGUMENT

The district court's decision to deny a stay notwithstanding the PTO's decision to institute CBM review of one of the two closely related patents-at-issue

directly contravenes both this Court's teachings in *Versata* and *VirtualAgility*, and Congress's intent that a stay would be granted pending CBM review except it in "extremely rare instances."   157 Cong. Rec. S1363 (daily ed. Mar. 8, 2011) (statement of Sen. Schumer).  Reversal is necessary to fulfill this Court's statutory mandate "to ensure consistent application of established precedent," AIA § 18(b)(2), and to further Congress' statutory objectives in enacting the Schumer-Kyl amendment to the AIA.

I.  This Court should review the district court's order denying a stay *de novo*. Both the statutory language and legislative history of the AIA confirm that Congress intended that this Court would review a district court's decision to deny a stay *de novo*, absent exceptional circumstances not present here.  By expressly authorizing *de novo* review and directing this Court to ensure "consistent application of this Court's precedent," Congress indicated its expectation that this Court would review district court decisions *de novo* in the ordinary case.  The Supreme Court itself has emphasized that the appropriate standard of review is *de novo*, rather than abuse of discretion, when, as here, the objective is to "unify precedent."  *Ornelas v. United States*, 517 U.S. 690, 697 (1996).  The AIA's legislative history likewise affirms that *de novo* review is central to the purpose of the interlocutory appeal provision of the Schumer-Kyl amendment.

II.  The district court's application of the AIA stay factors is fundamentally flawed and directly contradicts this Court's precedents.

A.  Because resolution of the CBM review process is likely to result in the invalidation of the '132 patent, a stay will significantly simplify any remaining trial necessary, while substantially informing a final determination of the closely-related '304 patent's validity by providing the district court with the benefit of the PTO's expertise.  The district court found that this factor weighed against a stay because CBM review could not "dispose of the *entire* litigation."  But this Court rejected an identical argument in *Versata*.  Moreover, the district court failed to account for the close similarities between the '132 and '304 patents, and the fact that CQG's own petitions for review are now pending.  That analysis is incompatible with *Versata* and *VirtualAgility* and led the court to discount the likelihood that the CBM review process could "dispose of the entire litigation: the ultimate simplification of issues."  *VirtualAgility*, 759 F.3d at 1314.

B.  The district court also erred by weighing the stage of litigation against a stay.  The district court itself recognized that "significant work remains to be done on this case."  That finding alone is sufficient to tip this factor in favor of a stay.  But the district court overlooked the significance of that finding, after once again failing to follow this Court's precedent.  In sharp conflict with this Court's guidance in *Versata*, the district court's analysis focused on what past discovery

was now complete, not what work remained. And despite *VirtualAgility*'s clear direction that courts should measure the stage of litigation from the date of *filing* the stay motion, the district court evaluated this factor from the date on which it *resolved* the motion—a month later. Those errors, along with clear factual errors about the remaining scope of discovery, irrevocably compromised the district court's analysis. As in *VirtualAgility*, the mere fact that a trial date is scheduled does not alter the conclusion that this factor weighs in favor of a stay, especially when "significant work" remained to be done before trial.

C. The undue prejudice factor also weighs against a stay. The district court itself acknowledged that this case is ten years old, such that "further delay would not suggest undue prejudice." Yet the court paradoxically concluded that TT might suffer "potential prejudice" due to a stay without identifying what that prejudice might entail. That finding was doubly flawed. First, the statute directs courts to test for "undue prejudice," not "*potential* prejudice." And second, the court failed to make the factual findings that this Court in *Versata* explained are necessary to sustain a finding of "undue prejudice." Moreover, in conflict with *VirtualAgility*, the district court also gave no weight to TT's failure to seek a preliminary injunction despite a *decade* of litigation. Finally, the district court's finding that a delay would result in "potential prejudice" is seriously undercut by the fact that TT *itself* sought a stay lasting several years earlier in the litigation.

18

The district court likewise erred by hypothesizing that CQG might enjoy a "*possible* tactical advantage." Once again, the district court watered down the statutory standard for a stay. Congress directed district courts to look for whether a stay would grant a party a "clear tactical advantage," not a *possible* one. Moreover, the district court once again failed to make any factual findings explaining *how* CQG would gain a possible tactical advantage—let alone a "clear" one—from a stay. And the court's speculation that CQG might have a dilatory motive is powerfully contradicted by the record, including the fact that CQG repeatedly notified the court of the status of the CBM petition and suggested that the trial date may have to be moved—many months before trial—and then immediately sought a stay after the PTO granted CBM review.

D. Finally, the court clearly erred by finding the last statutory factor only to be neutral. Because the PTO's ultimate determination will streamline or eliminate the need for trial altogether, while—at minimum—providing the district court substantial expert guidance regarding the validity of the patents-at-issue, a stay would substantially reduce the burden on the court and the parties. This factor therefore weighs strongly in favor of a stay, just as it did in *VirtualAgility* and *Versata*. And the court's belief that Congress intended for courts and the PTO to proceed in parallel in considering the validity of patents is contradicted by the AIA's legislative history, which makes clear that Congress intended that PTO's

19

CBM review process would be utilized "instead of, rather than in addition to, civil litigation."

III.  A proper application of the AIA factors compels a stay, no matter what standard of review is applied.  But taking a step back, this case also fails to present the sort of "extraordinary and extremely rare set of circumstances" that Congress anticipated would warrant the denial of a stay.  To the contrary, granting a stay would have directly advanced Congress's statutory objectives—minimizing the burdens on courts and private litigants engaged in expensive disputes over covered business method patents like those here, affording the expert agency responsible for patents an opportunity to employ its special expertise in reviewing the validity of such patents, and avoiding the possibility of conflicting judgments.  This Court should fulfill its statutory duty to ensure "consistent application" of its precedent by reversing the district court's order contravening that precedent.

The district court's order denying a stay should be reversed.

## ARGUMENT

### I.    THE STANDARD OF REVIEW IS *DE NOVO*

The language and legislative history of AIA § 18(b)(2) establish that Congress intended that this Court would review *de novo* a district court's decision to deny a stay pending CBM review absent unusual circumstances.

By its plain terms, the AIA explicitly alters this court's preexisting standard for reviewing a district court's decision to stay proceedings pending PTO review. Prior to the AIA, this Court "reviewed district court decisions on motions to stay pending U.S. Patent and Trademark Office proceedings under the abuse of discretion standard." *Benefit Funding*, 767 F.3d at 1385. The AIA, however, provides that "the Federal Circuit shall review the district court's decision to ensure consistent application of established precedent, and such review may be *de novo*," AIA § 18(b)(2). Indeed, "the only standard mentioned in the statute is *de novo* review." *VirtualAgility*, 759 F.3d at 1310.

Congress's explicit contemplation of *de novo* review squares with the statutory purpose of this provision—to ensure "*consistent* application of established precedent." AIA § 18(b)(2) (emphasis added). Abuse-of-discretion review is incompatible with that statutory mandate, because the implication of such deferential review is that two judges could reach the opposite result in "identical cases." *Rice v. Nova Biomedical Corp.*, 38 F.3d 909, 918 (7th Cir. 1994). Where

the goal is to promote *consistent* results and "prevent the affirmance of opposite decisions on identical facts from different judicial districts," the Supreme Court has held that "the standard for appellate review . . . should be *de novo*, rather than for 'abuse of discretion.'"  *United States v. Arvizu*, 534 U.S. 266, 275 (2002). Unlike review for abuse of discretion, "*de novo* review tends to unify precedent." *Ornelas v. United States*, 517 U.S. 690, 697 (1996); *see also Thompson v. Keohane*, 516 U.S. 99, 115 (1995) ("[T]he law declaration aspect of independent review" helps "unify precedent, and stabilize the law").  *De novo* review is essential to ensure that the AIA's stay standards are given consistent effect.

The AIA's legislative history affirms that Congress envisioned that this Court would review district courts' stay decisions *de novo* in order to fulfill its statutory responsibility to ensure "consistent application of established precedent." AIA § 18(b)(2).  As the Senator who sponsored Section 18 explained, "*de novo* review is central to the purpose of the interlocutory appeal provision in the Schumer-Kyl amendment, which is to ensure consistent application of standards and precedents across the country and to avoid one particular court with a favorable bench becoming the preferred venue of business method patent plaintiffs."  157 Cong. Rec. S1364 (daily ed. Mar. 8, 2011) (statement of Sen. Schumer); *see also id.* at S1379 (statement of Sen. Kyl) ("[T]he court of appeals cannot simply leave the stay decision to the discretion of the district court and

allow different outcomes based on the predilections of different trial judges."); *id.* at S1364 (statement of Sen. Schumer) ("On appeal the Federal Circuit can and should review the district court's decision *de novo*.").

Congress anticipated that this Court would deviate from *de novo* review only in rare circumstances. *See id.* ("It is expected that the Federal Circuit will review the district court's decision regarding a stay *de novo*, unless there are unique circumstances militating against a *de novo* review, such as subsequent requests for an interlocutory appeal in the same case."). Such unique circumstances are not present here. *De novo* review is particularly warranted where a district court elects to deny a stay in order to ensure that the court's analysis properly reflects "congressional intent that a stay should only be denied in extremely rare instances." *Id*. at S1363; *see also id.* at S1379 (statement of Sen. Kyl) (noting "congressional policy strongly favoring stays when proceedings are instituted under this section").

Indeed, the application of *de novo* review in this case fits hand-in-glove with the AIA's statutory purpose to ensure the "*consistent* application of established precedent" (AIA § 18(b)(2)) because, as explained next, the district court contravened this Court's precedents in several fundamental respects.[3]

---

[3]    In prior cases, this Court has recognized that the AIA authorizes *de novo* review, but found it unnecessary to engage in *de novo* review because the Court

## II.    THE DISTRICT COURT'S CONSIDERATION OF THE AIA STAY FACTORS WAS FUNDAMENTALLY FLAWED

The district court seriously erred in its application of the AIA's stay factors. The district court believed that three out of four AIA factors weighed *against* a stay, despite the PTO having concluded that one of the two closely-related patents here is "more likely than not" invalid.  As explained below, the district court's analysis directly contravenes this Court's precedent and Congress's intent.

### A.    The District Court Erred In Concluding That The First Factor Weighs Against A Stay

The first factor is "whether a stay, or the denial thereof, will simplify the issues in question and streamline the trial."  AIA § 18(b)(1)(A).  The district court clearly erred in concluding that this factor "weighs against a stay."  A4.

A stay would clearly simplify the issues in question and streamline the trial. The PTO instituted CBM review of one of the two closely-related patents-at-issue (the '132 patent) and CQG's own petitions for review of both patents remain pending.  Because the PTO has determined that the '132 patent claims are "more likely than not" unpatentable under § 101, completion of the CBM review process more likely than not will result in the invalidation of the '132 patent.  Invalidation

---

concluded that the district courts had erred in denying a stay even under abuse-of-discretion review.  *VirtualAgility Inc. v. Salesforce.com*, 759 F.3d 1307, 1310 (Fed. Cir. 2014); *Versata Software, Inc. v. Callidus Software, Inc.*, 771 F.3d 1368, 1371 (Fed. Cir. 2014).  This Court could take the same approach here because the district court's denial of the stay amounts to an abuse of discretion.  Nevertheless, the proper standard of review of the district court's order denying a stay is *de novo*.

of that patent would substantially simplify a trial here by cutting its scope *in half*—both for validity and infringement. Moreover, given the strong similarities between the '132 and '304 patents, the PTO's expert determination regarding the '132 patent validity would substantially inform the district court's analysis of the '304 patent, simplifying any trial for that patent as well. Therefore, the first stay factor weighs strongly in favor of a stay.

The district court's contrary conclusion is directly contradicted by this Court's precedents. The district court stated that this factor weighed against a stay because CBM review of the '132 patent could not "dispose of the *entire* litigation," since trial would still be necessary on the '304 patent. A4 (emphasis added). This Court, however, has rejected an identical argument. In *Versata*, 771 F.3d 1368, this Court held that the first stay factor may weigh strongly in favor of a stay "even when a CBM proceeding does not address *all* asserted patents, claims, or invalidity defenses." *Id.* at 1371-73 (emphasis added). *See, e.g.*, *id.* (favorably discussing *Versata Software, Inc. v. Dorado Software, Inc.*, No. 2:13-cv-00920-MCE-DAD, 2014 U.S. Dist. LEXIS 42509, 2014 WL 1330652, at *3 n.2 (E.D. Cal. Mar. 27, 2014) ("CBM review granted for only one of three asserted patents and for less than all claims")). And that conclusion is compelled by the text of AIA § 18(b)(1)(A), which looks not to whether a stay would eliminate the need for trial

altogether, but rather whether it could "*simplify* the issues in question *and streamline the trial*." (emphasis added).

A stay often simplifies and streamlines trial even when CBM review does not address every claim. This case is illustrative. The district court itself recognized "how convoluted this litigation has gotten." A200003-04 (4:22-5:4). TT alleges three different theories of infringement against more than 400 versions of software under both literal infringement and doctrine of equivalents theories. Moreover, as of the time the motion was filed, TT had identified 135 potential fact witnesses and nine expert witnesses, any of which may be called across separate bench and jury trials. A200063-64 (14:15-15:6) At minimum, a determination that the '132 patent is invalid would greatly streamline and simplify the issues remaining for trial, making it unnecessary to try all issues—from validity to infringement to damages—for that patent.

The district court also ignored that, "[i]n a situation like this one, a proper simplification analysis would look to what would be resolved by CBM review versus what would remain." *Versata,* 771 F.3d at 1372. In particular, this Court has recognized that where there are "strong similarities" between the claims subject to CBM review and any other claims remaining in the litigation, that consideration should be relevant to the court's analysis. *Id.* (quoting *Versata Software, Inc. v. Volusion, Inc.*, No. A-12-CA-893-SS, 2013 U.S. Dist. LEXIS

182842, 2013 WL 6912688, at *2 (W.D. Tex. June 20, 2013)).  Here, the PTO has

determined that a similar patent with "specifications . . . identical" to the '304

patent, *eSpeed,* 595 F.3d at 1345, is "more than likely not" invalid.  *See also supra*

at 7-9 (setting out overlap between the illustrative claims of the '132 and '304

patents).   Given the close relationship between the '132 and '304 patents, the

PTO's expert determination regarding the '132 patent's invalidity is likely to

substantially inform, and perhaps prove determinative to, the district court's

analysis of the '304 patent, further simplifying any trial necessary.  As in *Versata*,

"[t]he district court erred by not engaging in this inquiry."  771 F.3d at 1372.[4]

       This case involves only *two* patents—both of whose specifications are

"identical," *eSpeed*, 595 F.3d at 1345, and one of which the PTO already has found

more likely than not to be invalid.  That strongly weighs in favor of a stay.  This is

not a case, for instance, where the PTO initiates review only on one claim or patent

out of dozens or hundreds of unrelated patents or claims, where it is doubtful

whether the patent is even eligible for CBM review, *see, e.g.*, *Xilidev, Inc. v. Boku,

Inc.*, No. 13cv2795 DMS (NLS), 2014 U.S. Dist. LEXIS 157586, at *3 (S.D. Cal.

July 1, 2014), or where the parties are involved in "litigation Armageddon"

---

[4]    As PTO itself explained, its denial of TD Ameritrade's petition for CBM review
respecting the '304 patent did not turn on any substantive differences between that
patent and the '132 patent, but rather on TD Ameritrade's "insufficient analysis,"
consisting only of two paragraphs, one of which only recited case law.

involving a number of non-patent claims "in three different forums around the world," ensuring that "th[e] case will remain contentious, complex, and unresolved regardless of what emerges from reexamination." *Nippon Steel & Sumito Metal Corp. v. POSCO & POSCO Am. Corp.*, No. 12-2429 (DMC), 2013 U.S. Dist. LEXIS 62710, at *28-29 (D.N.J. May 2, 2013). Rather, this case involves just two patents. And a stay is likely to materially simplify this litigation by reducing the scope of trial *in half* and affording the PTO a meaningful opportunity to provide expert guidance relevant to the validity of both patents.

The district court also erred by ignoring CQG's own pending petitions for CBM review of the '132 and '304 patents—which will result either in invalidating both patents or in estopping CQG from reasserting its validity challenges at trial. *See* AIA §18(a)(1)(D). By July 2015, the PTO will have determined whether to institute review of the '304 patent, along with the additional claims CQG raises concerning the '132 patent. If the PTO institutes review of the '304 patent—as is likely given the "strong similarities" between it and the '132 patent, *Versata*, 771 F.3d at 1314 (citation omitted), it will be "more likely than not" that completion of the review process will "dispose of the entire litigation: the ultimate simplification of issues." *VirtualAgility*, 759 F.3d at 1327. And even if the PTO declined to institute review, CQG would be estopped from retrying validity before the district court. In either case, the district court no longer would need to hold a separate

bench trial on CQG's challenge to validity—meaningfully streamlining any remaining trial necessary.

The district court found it weighed against a stay that CQG's petition was "only recently filed." A4. But that overlooks that TD Ameritrade had already filed a petition as to the '132 patent, which CQG had brought to the attention of the court. Moreover, *Versata* makes clear that it is proper for this Court to account under this factor for developments in the CBM review process even *after* the district court resolves a motion to stay. *See* 771 F.3d at 1372 (accounting for PTO's decision to institute review of "subsequent round of petitions filed" covering additional patent claims following the district court's denial of a stay). It was clear error, therefore, for the district court to give no weight to petitions filed even *before* it ruled—on which the PTO will act within months. Whatever the relevance of the timing of CQG's petition for other factors, it does not weigh against a stay here, where the focus is only on whether a stay to permit resolution of the CBM review process will simplify or streamline trial.

Finally, the district court erred by misapprehending the consequences if the PTO invalidates the '132 patent. It believed that it weighed against a stay that although "review of the '132 patent could decide the issue of § 101 validity, there are other issues relating to the '132 patent that the Court would still have to resolve." A3-4. That was clear error. If the PTO rules that the '132 patent's

claims are unpatentable under § 101, then there would be *nothing* left for the court to resolve regarding that patent because the patent would be cancelled altogether. *See* 35 U.S.C. § 328(b). Moreover, if the PTO determines that the challenged claims are unpatentable under §101, the court would be left without authority to address "other issues relating to the '132 patent." A3-4. As this Court has admonished, "if claimed subject matter does not fall within the ambit of section 101, any determination on validity or infringement constitutes an impermissible advisory opinion." *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 718 (Fed. Cir. 2014) (Mayer, J., concurring). If the PTO ultimately concludes that the patents are invalid, therefore, any district court trial or rulings would be rendered purely advisory opinions. That too weighs heavily in favor of restraint.

Because it sharply conflicts with this Court's decisions, the district court's analysis of the first statutory factor alone strongly warrants reversal to ensure "consistent application of established precedent." AIA § 18(b)(2).

## B.    The District Court Erred In Concluding That The Second Factor Weighs Against A Stay

The second factor is "whether discovery is complete and whether a trial date has been set." AIA § 18(b)(1)(B). The district court concluded that this factor "weighs strongly against a stay." A5. That too was error.

As this Court has held, "the proper time to measure the stage of litigation" for purposes of this factor is "the date of the filing of the stay motion."

30

*VirtualAgility*, 759 F.3d at 1316.   CQG requested a stay in December 2014, promptly after the PTO initiated CBM review of the '132 patent and more than two months before the scheduled trial date.   The district court "acknowledge[d] that there remains *significant work to be done on this case*" even as of the date on which it issued its ruling denying a stay in January 2015—a month after CQG moved for a stay.   A4-5 (emphasis added).   The district court's conclusion that the stage of litigation nonetheless weighed "strongly against a stay," *id.* at 5, was the product of both legal and factor error on its part.

First, the district court improperly premised its analysis on what discovery the parties had already completed, rather than what work was outstanding before the trial.   Although the court acknowledged that "there remains *significant* work to be done," including "the final pretrial order, motions *in limine*, and any depositions that the parties have not had an opportunity to conduct," the court believed the extent of work outstanding was outweighed by the court's belief that "the bulk of discovery, dispositive motions, *Daubert* motions, and claim construction is complete."   A4 (emphasis added).   *Versata* makes clear, however, that in evaluating this stay factor, "[t]he correct test is one that focuses *prospectively* on the impact of the stay on the litigation, not on the *past* actions of the parties."   771 F.3d at 1375 (emphasis added).

31

The impact of the district court's backward-looking analysis was exacerbated by its improper focus on the state of litigation at the time it resolved CQG's motion, rather than at the time CQG filed it. *See, e.g.*, A4 ("*Since CQG filed this motion*, this Court has issued its ruling on one of the pending motions for summary judgment, issued an order on the second motion for summary judgment, and is in the process of finalizing its opinion memorandum and order on the last remaining motion for summary judgment"); *id.* (describing "all that *remains* of discovery" of time of ruling); at 4-5 ("the bulk of discovery, dispositive motions, and claim construction *is* complete and *what remains* is what always remains 60 days from trial" (emphasis added)). As this Court explained in *VirtualAgility*, however, "*the time of the motion* is the relevant time to measure the stage of litigation." 759 F.3d at 1317. That difference was significant here. At the time CQG filed its motion, not only did the numerous dispositive motions on which the district court relied remain unresolved, but four additional rebuttal expert reports were outstanding, and over ten depositions remained to be scheduled and taken. *See* Kelly Decl. ¶ 6, ECF No. 4-2.

The district court's analysis was further compromised by the court's clear factual errors regarding the scope of discovery remaining. The district court's analysis was largely premised on its mistaken belief that "all that remains of discovery" was a rebuttal expert and one deposition. A476. But *both* parties

32

acknowledged in their filings that multiple expert depositions were outstanding in addition to a fact deposition. *See* A100011 ("[B]etween the two sides, approximately eight depositions must be scheduled and taken within the next few weeks."); A100022-23 (acknowledging that there are "upcoming expert depositions" *in addition to* the "rebuttal [expert] report" and "one outstanding fact deposition")). The district court's conclusion was fatally infected by that threshold factual error. *Cf. Stockton East Water Dist. v. United States*, 761 F.3d 1344, 1349 (Fed. Cir. 2014) (when decision of court of first instance is premised on "clearly erroneous factual determinations," this Court "review[s] that court's legal determinations without deference").

Notably, discovery has only continued to mushroom—due to TT's own demands—even since the district court issued its ruling. On January 24, 2015, TT emailed CQG to request four additional depositions of seasoned traders relied upon by one of CQG's experts in a December 2014 expert report. (Reply Decl. in Support of Mot. to Stay Pending Appeal ¶ 6-7, ECF No. 21-2). Four days later, TT first disclosed its intent to depose two additional CQG employees, and indicated that it would seek leave to serve rebuttal reports on two subjects, and serve a supplemental expert report on a third subject. *Id.* at ¶ 12. As these developments illustrate, the amount of discovery remaining at the time CQG filed its motion was

substantial—and continues to grow even today. Indeed, depositions are scheduled to take place even *after* trial begins.

Courts have recognized that this factor weighs in favor of a stay even when some discovery is complete, but there remains substantial pretrial and trial work in addition to further discovery. *See, e.g.*, *Versata*, 771 F.3d at 1374 (Even when "the parties have conducted some discovery, [courts] must also be mindful of the burden on the parties and the court in completing both fact and expert discovery, resolving summary judgment motions, completing the Markman process, and preparing for trial."); *id.* (quoting *Broadcast Innovation, L.L.C. v. Charter Commc'ns, Inc.*, No. 03-cv-2223-ABJ-BNB, 2006 U.S. Dist. LEXIS 46623, at *26-27 (D. Colo. July 11, 2006)) ("[C]ourts considering this factor do not stop at discovery and trial settings, but rather, routinely inquire as to the occurrence of summary judgment arguments, rulings on summary judgment, and the status of the final pretrial order, among other elements"). Especially given that the district court itself recognized that "there remains significant work to be done on this case," A4, this factor weighed in favor of a stay.

A different result is not warranted because the district court set a trial date. In *Versata*, this Court found that this factor "strongly favor[ed] a stay" even though the court already had set a trial date. 771 F.3d at 1373-74; *see also Zillow, Inc. v. Trulia, Inc.,* No. C12-1549 JLR, 2013 U.S. Dist. LEXIS 144919, at *18 (W.D.

Wash. Oct. 7, 2013) (granting stay notwithstanding scheduled trial date). As the district court did here, courts frequently set trial dates well in advance, even when substantial work remains and then reevaluate as cases evolve. Courts also move such trial dates all the time, for any number of reasons—including because of the amount of work remaining in the case. Indeed, the district court here repeatedly raised the possibility of moving the trial date. In July 2014, the district court even stated that, in light of the CBM review process as to the '132 patent, the court would put "an asterisk by [the February 23, 2015] trial date so when we get to that point, if we need to move [the trial], the Court will move it," and committed to "start looking at my cal[endar] for 2015 to see and see if we can reserve a couple of spots where you could move to to make sure that you are still within that time frame of 2015." A200038-39 (11:19-12:10). Only after it denied a stay in January 2015, did the court insist on holding the February 2015 trial date despite the PTO's decision to institute review of the '132 patent.

Nor does the February 23, 2015 trial date support the district court's conclusion. First, as noted, this factor is gauged from the standpoint of when the motion for a stay was filed (December 12, 2014) and not from when the stay was denied (January 13, 2015). At the time when CQG moved for a stay, the trial date was still nearly two and a half months out. And second, as noted, the court significantly underestimated both the substantial volume of discovery that

35

remained to be completed during that period and the other motions and preliminary work that remained to be completed and decided before trial. Indeed, the district court docket reflects roughly *175 new entries* since the stay was denied—and even more since the stay was first sought. A131-44. Granting a stay would have spared the parties and the court the expense and burden of that substantial work—which the district court itself recognized was "significant," A4—thereby advancing one of Congress' chief aims in enacting Section 18 of the AIA. Moreover, just a few months earlier, the district court itself had stated that it would put an "asterisk" by trial date in case it need to be moved.

In any event, a set trial date is just one of several considerations that Congress instructed courts to take into account in considering whether to grant a stay. As this Court's precedent establishes, Congress did not make it dispositive, even within the context of whether this particular statutory factor counsels in favor of a stay. *See Versata*, 771 F.3d at 1373-74 (finding second factor "strongly weighs" in favor of stay even though trial date set). Particularly here, where the district court signaled openness to moving trial throughout 2014 because of the "convoluted" state of the case and the then-pending CBM review process, a set trial date did not diminish the significant work remaining to be done before, during, and after any prospective trial, as of the time when CQG sought a stay.

## C.    The District Court Erred In Concluding That The Third Factor Weighs Against A Stay

The third factor is "whether a stay, or the denial thereof, would unduly prejudice the nonmoving party or present a clear tactical advantage for the moving party." AIA § 18(b)(1)(C). The district court concluded that "[t]he combination here of *potential* prejudice to TT and the *possible* tactical advantage and dilatory motive attributable to CQG weighs against a stay." A6 (emphasis added). It was wrong on both counts.

### 1.    The district court's analysis of "undue prejudice" is flawed

The most important factor bearing on the question of "undue prejudice" is the prior history of this litigation. Here, the district court actually got it *right*. The district court recognized that "the case is nearly ten years old and thus further delay would not suggest undue prejudice." A5. Yet, paradoxically, the district court concluded that TT might suffer "potential prejudice" due to a stay, without making any factual findings as to what that prejudice would actually entail. A5-6. That was clear error.

First, the district court misapplied the statutory standard. The statute directs district courts to determine whether a stay actually "would unduly prejudice" the non-movant—not whether a party might suffer "*potential* prejudice." AIA § 18(b)(1)(C). Here, TT's own willingness to propose or accept stays lasting years

cuts sharply against any argument that TT would be unduly prejudiced now by a short further delay.

Second, the district court erred in failing to make adequate factual findings to justify a finding of undue prejudice. This Court has made clear that an undue prejudice determination must be grounded on actual findings. *See Versata*, 771 F.3d at 1374 n.6 ("Absent factual findings, we decline to consider whether either party would be unduly prejudiced"). "[W]hether the patentee will be unduly prejudiced by a stay in the district court proceedings during the CBM review, like the irreparable harm-type inquiry, focuses on the patentee's *need* for an expeditious resolution of its claim." *VirtualAgility*, 759 F.3d at 1318 (emphasis added). It is difficult, if not impossible, for TT to show a need for expeditious resolution of this dispute, given that it sought or at least consented to long delays lasting *five years*. And as this Court has explained, the fact that the parties to the litigation are competitors or that a stay might delay a party's realization of monetary damages or permanent injunctive relief does not, without more, establish irreparable harm. *See id.* The court's failure to identify any factual basis for its conclusion that TT would be unduly prejudiced was incompatible with this Court's precedent.

Third, the district court erred by giving no weight to TT's failure to seek a preliminary injunction. "[T]he fact that it was not worth the expense [for a party]

to ask for this remedy contradicts [its] assertion that it needs injunctive relief as soon as possible" and "weigh[s] against [the party's] claim[] that it will be unduly prejudiced by a stay." *VirtualAgility*, 759 F.3d at 1319. Courts are rightly skeptical when a party claiming undue prejudice from purported competitive harm never sought a preliminary injunction. *See, e.g.*, *Zillow,* 2013 U.S. Dist. LEXIS 144919, at *21 ("Many courts have found . . . that attempts by a patentee to argue undue prejudice are undermined if the patentee has elected not to pursue preliminary injunctive relief."); *Studer Prof'l Audio GmbH v. Calrec Audio Ltd.*, No. 2:12-cv-02278 (WHW), 2012 U.S. Dist. LEXIS 104105, at *4-6 (D.N.J. July 25, 2012) (a stay is not unduly prejudicial if the parties are direct competitors, but the plaintiff did not seek a preliminary injunction); *Autoalert, Inc. v. Dominion Dealer Solutions, LLC*, No. SACV 12-1661-JST (JPRx) 2013 U.S. Dist. LEXIS 171890, at *8 (C.D. Cal. May 22, 2013) ("Plaintiff's failure to file for a preliminary injunction in the seven months since it filed its Complaint further suggests that monetary damages will adequately compensate Plaintiff should Defendants be found liable for patent infringement."); *LMT Mercer Grp., Inc. v. Maine Ornamental, LLC,* No. 10-4615 (FLW), 2011 U.S. Dist. LEXIS 55549, at *33-34, (D.N.J. May 24, 2011) ("[W]hile the Court appreciates Plaintiff's concern that Defendants are competitors who may continue selling infringing goods and eroding market share and goodwill during a stay, Plaintiff chose not to file a

preliminary injunction in this matter."). Particularly given the length of this litigation, it weighs heavily against any inference of undue prejudice that TT never sought a preliminary injunction over ten years of litigation—instead itself seeking or agreeing to lengthy stays.

Fourth, the district court ignored that TT has licensed the underlying patent rights to dozens of other competitors. That fact seriously undercuts the court's reliance on its generalized observation that CQG and TT are "direct competitors." A6. *See Destination Maternity Corp. v. Target Corp.*, 12 F. Supp. 3d 762, 768 (E.D. Pa. 2014) (the presence of "multiple competitors in the field belie the assertion that [the party arguing against a stay] will experience undue prejudice"); *Neste Oil Oyj v. Dynamic Fuels, LLC*, No. 12-1744-GMS, 2013 U.S. Dist. LEXIS 92416, at *8 (D. Del. July 2, 2013) ("The presence of multiple active firms in the relevant market . . . may decrease the likelihood of such harm befalling the plaintiff."). *Market-Alerts Pty. Ltd. v. Bloomberg Finance L.P.*, 922 F. Supp. 2d 486 (D. Del. 2013), which the district court cited (A6), is not to the contrary. That case did not even consider licensing.

Finally, this case has been pending for a decade (in part due to the lengthy stays that TT sought or consented to), which is another compelling reason to reject the suggestion that staying proceedings for several additional months would result in undue prejudice. The district court apparently discounted those lengthy stays

because it considered them sensible.  *See* A5-6 ("[T]he previous stays to litigation . . . conserved judicial resources . . . and had the potential for complete resolution short of trial had an agreement been reached.").  But the relevant consideration is not whether the prior stays were justified, but simply that TT sought or agreed to them—a fact that weighs heavily against concluding that TT would be unduly prejudiced by the comparatively short stay requested here.

### 2.    The district court's analysis of "clear tactical error" is flawed

The district court likewise erred in attributing a "possible tactical advantage and dilatory motive" to CQG, and weighing that determination against a stay.  A6. First, the district court again misapplied the statutory test when concluding that CQG might enjoy a "possible tactical advantage."  As Congress made explicit in its statutory language, it weighs against a stay only where it would afford the moving party a "*clear* tactical advantage."  AIA § 18(b)(1)(C) (emphasis added). The district court's equivocal suggestion that CQG might enjoy a "*possible* tactical advantage" was an insufficient basis on which to deny a stay.

Second, the district court failed to make adequate findings as to *how* a stay would afford CQG a "clear tactical advantage."  *Versata* establishes that a court must point to a sufficient factual basis to establish that a clear tactical advantage is implicated.  *See* 771 F.3d at 1374-75.  But the district court identified none.  And particularly where TT is not unduly prejudiced by a stay given its ability to recover

41

damages if it prevails, TT failed to show CQG would enjoy a "clear tactical advantage." *See Broadcast Innovation, LLC v. Charter Commc'n, Inc.*, No. 03-cv-2223-ABJ-BNB, 2006 U.S. Dist. LEXIS 46623, at *32 (July 11, 2006) ("This factor is best summarized by one question: do the Plaintiffs have an adequate remedy at law?  Because they do, this factor weighs heavily in favor or staying the case.").

Third, the district court overlooked that the advantages of a stay are exactly the ones that Congress recognized when it enacted the AIA.  The PTO has determined that the '132 patent is "more likely than not" invalid, making it more likely than not that it will be adjudged invalid by the end of the year.  And because the '304 patent is closely related in all material respects, it is likely to suffer the same fate.  Accordingly, the only "advantage" CQG is seeking by pursuing a stay are those that Congress intended it should obtain: "review[] by the experts at the Patent Office under the correct (*Bilski*) standard" and relief from expensive and expansive litigation costs that will only further mushroom on appeal if the PTO and district court enter inconsistent verdicts.  *See supra* at 4.

Finally, the district court's speculation of a "possible" dilatory motive is contradicted by the record—which establishes that CQG's conduct was opposite of dilatory.  When TD Ameritrade filed a petition seeking CBM review in May 2014, CQG immediately notified the district court and suggested moving the trial date in

light of the petition.  *See* A200006-07 (7:19-8:13).  CQG again advised the court about the petition in July 2014 and advocated for moving the trial.  *See, e.g.*, A200037 (10:3-15).  When the PTO determined that the '132 patent was "more likely than not" invalid, CQG quickly informed the court and sought a stay.  And when the district court denied that stay, CQG immediately sought relief from this Court and sought to expedite this appeal.

The district court questioned CQG's decision not to file a petition for CBM review until after the PTO acted on TD Ameritrade's petitions.  A6.  But CQG sensibly believed there was no sense in filing a second petition while TD Ameritrade's petition covering the same patent was pending.  And when CQG notified the court of the TD Ameritrade petition, the court never once suggested that CQG ought to file its own petition or risk losing its statutory right to PTO review or to obtain a stay.  To the contrary, the court said it would put an "asterisk" by the trial date in view of the TD Ameritrade petition and move the trial if necessary.  A200038-39 (11:19-12:5).  Moreover, the court acknowledged that CQG's contention that the PTO should be permitted to resolve the petitions prior to trial was "not an unreasonable position" as late as July 2014.  A200037 (10:11-16).  CQG has continued to advocate for that position diligently at every step.  The court pointed to nothing that took place between July 2014 and the time the court

surprisingly denied a stay in January 2015 that could justify the district court's change of heart about the promptness or reasonableness of CQG's actions.

The district court also wrongly faulted CQG because it did not seek CBM review immediately after the CBM review process was announced in late 2012. Very few CBM petitions were filed in the first year after the program became active. *See* U.S. Patent & Trademark Office, AIA Statistics, *available at* http://www.uspto.gov/patent/laws-and-regulations/america-invents-act-aia/aia-statistics (last visited Feb. 19, 2015). "[P]etitioners' initial reluctance to use the new procedure" reflected a number of considerations, including uncertainty regarding the scope of the program and its procedures. *See, e.g.*, Megan M. La Belle & Heidi Mandanis Schooner, *Big Banks and Business Method Patents*, 16 U. Pa. J. Bus. L. 431, 466 (2014). In addition, as even TT has acknowledged, the state of the case law governing § 101 remained in some "flux," *see* Opp'n to Mot. for Stay Pending Appeal at 5 n.2, ECF No. 18, and many petitioners have acted with caution while courts have clarified the state of the law. *See, e.g.*, *Alice Corp. Pty. Ltd.*, 134 S. Ct. at 2356; *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289 (2012).

The district court also appeared to weigh against a stay that CQG would not be estopped from challenging validity in district court in the event that the PTO upholds the validity of the '132 patent in the TD Ameritrade proceeding. Having

now filed its own petitions for CBM review, however, that concern is moot. The resolution of CQG's petition will either vindicate CQG's assertion that both patents are invalidate or estop it from making those challenges to the district court. These circumstances counsel in favor of a stay, not against it.

### D.     The District Court Erred In  Finding That The Fourth Factor Is "Neutral"

The final stay factor is "whether a stay, or the denial thereof, will reduce the burden of litigation on the parties and on the court." AIA § 18(b)(1)(D). The district court concluded that the final factor was "neutral." A6. That was obvious error because this factor unquestionably supports a stay.

The parties are presently working around the clock to prepare for a bench and jury trial involving numerous potential issues of validity, infringement, and damages that likely will necessitate voluminous pretrial filings, testimony from dozens of witnesses, and extensive post-trial motions. Meanwhile, the parties also are addressing many of the same issues before the PTO, resulting in duplicative efforts. A stay, by contrast, more than likely would result in the invalidation of the '132 patent, significantly reducing the scope of trial and the burden on the parties and the court. Moreover, given this Court's own prior acknowledgement that the '132 and '304 patents are materially identical, the PTO's expert guidance on the validity of the '132 patent's claims would substantially inform all claims at issue.

Even staying a case in which substantial work already has been completed reduces the burden of litigation. *See Versata*, 771 F.3d at 1375 (quoting *Sightsound Techs., LLC v. Apple, Inc.*, No. 11–1292, 2013 WL 2457284, at \*3 (W.D. Pa. June 6, 2013) ("[W]hile much has been done thus far, there is more to come. The parties and Court will expend further substantial resources in this litigation, through completing discovery and trial.")). Here, the likely prospect that CBM review will cut this litigation in half by invalidating one of the two patents-at-issue—at minimum—weighs heavily in favor of a stay.

The district court's conclusion that this stay factor was "neutral" does not withstand scrutiny. First, the court believed that "the Court and the parties [would] be spared the costly litigation" only "[i]f the USPTO invalidates the patents." A7. But that analysis is directly contradicted by *VirtualAgility,,* 759 F.3d at 1311-13. In *VirtualAgility*, like this case, the PTO had simply made a determination to grant CBM review (after finding it "more likely than not" that one of the patents-at-issue was invalid); there, as here, the PTO had not yet declared the patent invalid. This Court, however, expressly found that the fourth factor "*strongly* favors a stay." *Id.* at 1311 (emphasis added).

Moreover, whether or not the PTO invalidates the '132 patent, its expert determination would still streamline trial by significantly informing the district court's own invalidity analysis. *See, e.g., Target Therapeutics, Inc. v. SciMed Life*

46

*Sys., Inc.*, No. 4:96-cv-02837-DLJ, 1995 U.S. Dist. LEXIS 22517, at *4-5 (N.D. Cal. Jan. 13, 1995) ("[W]aiting for the outcome of the reexamination could eliminate the need for trial if the claims are cancelled or, if the claims survive, facilitate trial by providing the court with expert opinion of the PTO and clarifying the scope of the claims.").

Second, the district court considered significant that "the language and legislative history of the reexamination statute show that Congress expected reexamination to take place *concurrent with litigation*." A6 (citation omitted) (emphasis added). However true for pre-AIA reexamination procedures, it is inaccurate for the CBM review process. *See, e.g.*, 157 Cong. Rec. S1363 (daily ed. Mar. 8, 2011) (statement of Sen. Schumer) ("This program should be used *instead of, rather than in addition to, civil litigation*.") (emphasis added).

Potentially cutting the scope of trial in half, and at a minimum affording the district court the benefit of the PTO's expertise on the question of the patents' validity, would substantially reduce the burden on the parties and the district court. The final stay factor therefore weighs strongly in favor of a stay.

## III. THIS CASE DOES NOT PRESENT THE SORT OF "EXCEPTIONAL AND EXTREMELY RARE CIRCUMSTANCES" THAT COULD JUSTIFY THE DENIAL OF A STAY

For the reasons discussed above, each of the AIA factors weighs in favor of a stay and, at a minimum, a proper balancing of those factors weighs in favor of a

stay.  Taking a step back, moreover, this case does not present the sort of rare circumstances which Congress contemplated would alone necessitate the denial of a stay.

The AIA's text and legislative history make clear that Congress "expected that, if a proceeding against a business method patent is instituted, the district court would institute a stay of litigation unless there were *an extraordinary and extremely rare set of circumstances not contemplated in any of the existing case law related to stays pending reexamination*."  157 Cong. Rec. S1364 (daily ed. Mar. 8, 2011) (statement of Sen. Schumer) (emphasis added); *see also id.*. at S1379  (statement of Sen. Kyl) (noting "congressional policy strongly favoring stays when proceedings are instituted under this section").  Neither TT, nor the district court pointed to any circumstances so unprecedented or extreme to warrant departure from the "congressional policy strongly *favoring* stays."  *Id.* (emphasis added).

Because Congress was concerned with "ensur[ing] predictability and stability in stay decisions across different district courts, and limit[ing] the incentive to forum shop," *id.* at S1380, Congress afforded parties aggrieved by a district court decision whether to stay an action the rare and valuable statutory right to take "an immediate interlocutory appeal" to this Court and mandated that "the Federal Circuit shall review the district court's decision to ensure consistent

application of established precedent, and such review may be de novo," AIA § 18(b)(2).   Reversal is warranted here to ensure consistent application of established precedent and to further Congress' intention that the PTO's expert review "program should be used instead of, rather than in addition to, civil litigation."   157 Cong. Rec. S1364 (daily ed. Mar. 8, 2011) (statement of Sen. Schumer).

Even if this Court were to conclude that one or more factors weighed more strongly in favor of a stay than others, this case hardly presents the sort of extremely rare and unprecedented facts under which Congress expected that a stay would not issue.   And the district court's intention to proceed with a trial with ongoing proceedings at the PTO underway only highlights the substantial burden to both courts and parties should the PTO and district court reach conflicting determinations regarding the validity of the patents-at-issue—a problem that would continue in this case even after a trial were held.   *See, e.g.*, *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 721 F.3d 1330, 1333-36 (Fed. Cir. 2013) (describing years of litigation following from conflicting determinations of patent validity during reexamination by PTO and litigation before district court).

In sum, Congress plainly intended that a stay would be entered in the circumstances presented here, and it provided a direct path for appellate review of the denial of a stay to "ensure consistent application of established precedent"

under the AIA § 18(b)(2).  The "consistent application" of that precedent here requires reversal of the district court's order denying a stay.

## CONCLUSION

For the foregoing reasons, the district court's order denying a stay should be reversed.

February 19, 2015                                    Respectfully submitted,

                                                     /s/ Gregory G. Garre
                                                     _____

Adam G. Kelly                            Gregory G. Garre
William J. Voller                        Gabriel K. Bell
LOEB & LOEB LLP                          Michael E. Bern
321 North Clark Street, Suite 2300       LATHAM & WATKINS LLP
Chicago, IL 60654                        555 Eleventh Street, NW
(312) 464-3100                           Suite 1000
                                         Washington, DC 20004
Laura A. Wytsma                          (202) 637-2207
LOEB & LOEB LLP
10100 Santa Monica Boulevard
Los Angeles, California 90067
(310) 282-2000


*Counsel for Defendants-Appellants CQG, Inc. and CQGT, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2015, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Federal Circuit using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

/s/ Gregory G. Garre
Gregory G. Garre

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Fed. R. of App. P. 32(a)(7)(B) because the brief contains 12,025 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because this brief was prepared using Microsoft Word 2003 in 14-point Times New Roman font.

Dated: February 19, 2015                    /s/ Gregory G. Garre
                                             Gregory G. Garre

# ADDENDUM

# TABLE OF CONTENTS

## Addendum Pursuant to Federal Circuit Rule 28(a)(12) and Federal Rule of Appellate Procedure 28(f)

| Page | Description |
|------|-------------|
| A1 | Memorandum Opinion and Order, dated January 13, 2015 (ECF No. 876) |
| ADD-1 | AIA § 18(a)-(b), Pub. L. No. 112-29, § 18(a)-(b), 125 Stat. 284, 329-31 (2011) |

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| TRADING TECHNOLOGIES INTERNATIONAL, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 05-cv-4811 |
| CQG, INC., and CQGT, LLC, | ) ) | |
| Defendants. | ) ) | Judge Sharon Johnson Coleman |

## MEMORANDUM OPINION AND ORDER

On December 12, 2014, CQG filed a Motion to Stay the case pending Covered Business Method Review by the U.S. Patent and Trademark Office [845]. The Court allowed Trading Technologies until December 29, 2014, to respond. No reply was allowed, but one was filed.[1] For the reasons stated below, the motion is denied.

**Background**

The instant motion stems from a petition filed by TD Ameritrade Holding Corp. et al. on May 19, 2014, with the USPTO requesting review under the transitional program for covered business method patents of U.S. Patent No. 6,772,132 B1 (one of the patents-in-suit in our case – the '132 patent).[2] TD Ameritrade challenged the patentability of claims 1-56 of the '132 patent under 35 U.S.C. § 101 (among other things). On December 4, 2014, the USPTO determined that the petition demonstrates that it is more likely than not that the challenged claims are unpatentable under 35 U.S.C. § 101, and therefore instituted a covered business method patent review of claims

---

[1] The Court subsequently granted TT's Motion to Strike the Reply [872].

[2] Notably, TD Ameritrade is a defendant in a lawsuit filed by TT currently pending before Judge Virginia Kendall, 10 C 715. In that case, TD Ameritrade filed the motion to stay on May 22, 2014. Judge Kendall has not yet ruled on that motion. It is not uncommon for courts to wait to rule on a motion to stay until after the USPTO has issued its decision whether to grant review. TT filed its response in opposition to the stay in that case on December 16, 2014.

**A1**

1-56 of the '132 patent. (Dkt. 845-6, Ex. 5). CQG represented in their motion its *intention* to file a petition with the USPTO challenging the patentability of the '304 patent (the other patent-in-suit in this case) under 35 U.S.C. § 101. CQG filed a petition with the USPTO for a covered business method patent review for each of the patents-in-suit on January 9, 2015, after this motion was briefed and taken under advisement by the Court.

**Legal Standard**

The America Invents Act ("AIA") was signed into law on September 16, 2011, and the transitional program for covered business method patents came into effect one year later in September 2012. "The AIA permits covered business method review only for 'covered business method patents,' which it defines as 'patent[s] that claim[ ] a method or corresponding apparatus for performing data processing or other operations used in the practice, administration, or management of a financial product or service, except that the term does not include patents for technological inventions." *Market-Alerts Pty. Ltd. v. Bloomberg Finance LP et al.,* 922 F.Supp.2d 486, 491 (D. Del. Feb. 3, 2013)(citing America Invents Act (AIA), Pub. L. No. 112-29, § 18(d)(1), 125 Stat. 331 (2011)). The covered business review process lasts no more than 18 months, issuing a final written decision within twelve months of its beginning its review. *See* 77 Fed. Reg. 48757 (2012).

The AIA identifies four factors that a district court should consider when deciding whether to grant a stay: (1) whether a stay, or the denial thereof, will simplify the issues in question and streamline the trial; (2) whether discovery is complete and whether a trial date has been set; (3) whether a stay, or the denial thereof, would unduly prejudice the nonmoving party or present a clear tactical advantage for the moving party; and (4) whether a stay, or the denial thereof, will reduce the burden of litigation on the parties and on the court. *Versata Software, Inc. v. Callidus Software, Inc.,* 771 F. 3d 1368, 2014 U.S. App. LEXIS 21962, *4 (Fed. Cir. Nov. 20, 2014)(citing § 18(b)(1) of the AIA).

**Discussion**

CQG moves for a stay of the case in its entirety, arguing that section 101 subject matter patentability is a threshold question that should be resolved before the court considers subordinate issues such as infringement and validity. CQG refers to Judge Mayer concurring opinion in *Ultramercial, Inc. v. Hulu, LLC,* 772 F.3d 709, 2014 U.S. App. LEXIS 21633, *20 (Fed. Cir. Nov. 14, 2014), for the proposition that this Court must stay the litigation to allow the USPTO to determine patentability in the first instance. In his concurrence, Judge Mayer likens section 101 determination to a jurisdictional inquiry, stating "if claimed subject matter does not fall within the ambit of *section 101*, any determination on validity or infringement constitutes an impermissible advisory opinion." *Id.* Judge Mayer goes on to recite with approval some of the benefits of addressing section 101 at the outset of litigation.

*I. Four Factors for a Stay*

With respect to the four factors, CQG first argues that the USPTO review may eliminate the '132 patent entirely from this case. CQG also asserts that extensive and costly expert discovery remains to be completed as well as ruling on the three motions for summary judgment and pretrial preparation. Further, CQG argues that a stay will neither prejudice TT nor give CQG an unfair advantage. Lastly, CQG maintains that staying the case will reduce the burden on the Court and the parties. This Court weighs each factor in turn.

*1. Simplify the Issues and Streamline the Trial*

"[T]his simplification factor weighs more strongly in favor of a stay when all of the litigation claims are undergoing CBM review." *Versata Software, Inc.,* 2014 U.S. App. LEXIS 21962, at *7. Here, only one of the patents-in-suit is subject to covered business method review. Although review of the '132 patent could decide the issue of § 101 validity, there are other issues relating to the '132 patent

**A3**

that the Court would still have to resolve. Moreover, the '304 patent is not implicated in any covered business method review and thus this Court would have to resolve all issues relating to that patent. In *Virtualagility, Inc. v. Salesforce.com, Inc. et al.*, 759 F.3d 1307, 1314 (Fed. Cir. 2014), cited by CQG, the court found it significant that CBM review included all asserted claims on the sole asserted patent and therefore review could dispose of the entire litigation. CQG only recently filed a petition with the USPTO for review of the '304 patent. This factor therefore weighs against a stay.

*2. Stage of Litigation*

CQG asserts that there is extensive and costly expert discovery remaining as well as pending motions for summary judgment and pretrial preparation. "Staying a case at an early juncture 'can be said to advance judicial efficiency and maximize the likelihood that neither the [c]ourt nor the parties expend their assets addressing invalid claims'... On the other hand, when confronted with a motion to stay in the later stages of a case, 'the [c]ourt and the parties have already expended significant resources on the litigation, and the principle of maximizing the use of judicial and litigant resources is best served by seeing the case through to its conclusion." *Market-Alerts Pty. Ltd.*, 922 F.Supp.2d at 494.

Here, the case is set for trial in fewer than 60 days (73 days from filing of the motion to stay), pretrial dates are set, claim construction is complete, and all that remains of discovery is a rebuttal expert and the deposition of CQG's astrologer Mr. Hwang. Since CQG filed this motion, this Court has issued its ruling on one of the pending motions for summary judgment, issued an order on the second motion for summary judgment, and is in the process of finalizing its opinion memorandum and order on the last remaining motion for summary judgment.[3] While this Court acknowledges that there remains significant work to be done on this case, the bulk of discovery,

---

[3] The Court entered an order stating that it would treat CQG's motion for summary judgment on willfulness as a motion for directed verdict given the short time remaining before trial and the need for TT to depose Mr. Hwang before it is able to respond to the motion. The Court expects to issue its ruling on CQG's motion for summary judgment on the lack of written description within 10 days.

dispositive motions, *Daubert* motions, and claim construction is complete and what remains is what always remains 60 days from trial – the final pretrial order, motions *in limine*, and any depositions that the parties have not had an opportunity to conduct. This factor weighs strongly against a stay.

*3. Undue Prejudice vs. Tactical Advantage*

CQG asserts that a stay would neither prejudice TT nor provide a tactical advantage to CQG. Courts consider a variety of factors to determine prejudice, including the timing of the stay request, the status of review proceedings, and the relationship between the parties. *See See Market-Alerts Pty. Ltd.,* 922 F.Supp.2d at 494. Indeed, the potential for delay does not, by itself, establish undue prejudice. Here, the case is nearly ten years old and thus further delay would not suggest undue prejudice. However, evidence of dilatory motive could point against a stay. *See Virtualagility, Inc.,* 759 F.3d at 1319. In *Virtualagility, Inc.,* the court noted that defendant Salesforce.com filed a covered business method review petition less than four months after Virtualagility instituted infringement action and moved to stay almost immediately. *Id.* By contrast, here, CQG only recently (January 9, 2015) sought review by the USPTO. CQG provides no reason for its delay in seeking such review despite having since September 2012 when CBM review came into effect. CBM review, even of the '132 patent, is in its early stages since the USPTO just decided on December 4, 2014, to allow review. At least one court has found that the status of the administrative process weighs against a stay if it is in the early stages. *See Market-Alerts Pty. Ltd.,* 922 F.Supp.2d at 495. Additionally, CQG is not the petitioner of the CBM review recently allowed by the USPTO and will not be estopped from asserting any invalidity theories that the USPTO adjudicates during the review. CQG's delay in seeking such review on its own behalf until 60 days before the trial date suggests an effort to impede the proceedings.

CQG raises the other litigation stays in this case as evidence of a lack of prejudice to TT. Yet, the previous stays to litigation, for an appeal of the claim construction issues in the *eSpeed*

litigation and for settlement negotiations, conserved judicial resources by preventing the need for relitigation of certain issues and had the potential for complete resolution short of trial had an agreement been reached. That is not the situation with the present request for a stay. Additionally, courts are reluctant to stay proceedings where the parties are direct competitors as CQG and TT are here. *See Market-Alerts Pty. Ltd.,* 922 F.Supp.2d at 495. The combination here of potential prejudice to TT and the possible tactical advantage and dilatory motive attributable to CQG weighs against a stay.

*4. Burden of Litigation*

CQG only recently petitioned the USPTO for CBM review of the '304 patent. CQG also submitted its own petition for CBM review of the '132 patent. If the USPTO invalidates the patents, only then will the Court and the parties be spared the costly litigation. Yet, "the language and legislative history of the reexamination statute show that Congress expected reexamination to take place concurrent with litigation, and that cancellation of claims during reexamination would be binding in concurrent litigation." *Fresenius USA, Inc. v. Baxter Int'l, Inc.,* 721 F.3d 1330, 1339 (Fed. Cir. 2013). Therefore, this factor is neutral.

*II. Patent Eligibility under 35 U.S.C. § 101*

Patent Eligibility under 35 U.S.C. § 101 is a question of law proper for consideration by the district court. *In re BRCA1- & BRCA2-Based Hereditary Cancer Test Patent Litig.,* No. 2014-1361, 2014 WL 7156722, at *2 (Fed. Cir. Dec. 17, 2014). The Supreme Court has set forth analytical framework to distinguish patents under § 101 that claim patent-ineligible laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts. *DDR Holdings, LLC v. Hotels.com, L.P., et al.,* 2014 U.S. App. LEXIS 22902, *20-21 (Fed. Cir. Dec. 5, 2014) (citing *Mayo v. Collaborative Servs. v. Prometheus Labs., Inc.,* 132 S.Ct. 1289, 1294, 182 L. Ed. 2d 321 (2012)). As explained in *Alice Corp. v. CLS Bank Int'l,* 134 S.Ct. 2347, 2355, 82 L. Ed. 2d 296 (2014),

first the court determines whether the claims at issue are directed to a patent-ineligible abstract idea. If so, then the court considers the elements of each claim to determine whether the additional elements transform the nature of the claim into a patent-eligible application of that abstract idea. *Id.* After *Alice* there is no doubt that "recitation of generic computer limitations does not make an otherwise ineligible claim patent-eligible." *DDR Holdings, LLC,* 2014 U.S. App. LEXIS 22902, at *22. In *DDR Holdings*, the Federal Circuit found that the claims at issue there were patent-eligible because "they do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet. Instead, the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *Id.* at *26.

TT argues that following *DDR Holdings*, the patents-in-suit are patent-eligible under § 101 and that TT is likely to ultimately prevail in the covered business method review in the USPTO. Examination by this Court of the patents-in-suit under § 101 is a question for another time as "Congress clearly did not intend district courts to hold mini-trials reviewing the PTAB's decision on the merits of the CBM review." *Virtualagility, Inc.,* 759 F.3d at 1313. Nevertheless, it is a question properly within this Court's purview and will necessarily be addressed prior to the conclusion of the trial.

**Conclusion**

Based on the foregoing, this Court denies CQG's Motion to Stay [845].

IT IS SO ORDERED.

Date: January 13, 2015

Entered: Sharon Johnson Coleman
U.S. DISTRICT JUDGE

7

**A7**

PL 112–29, 125 Stat. 284
September 16, 2011
**LEAHY–SMITH AMERICA INVENTS ACT**

* * *

## Sec. 18.  TRANSITIONAL PROGRAM FOR COVERED BUSINESS METHOD PATENTS.

(a) TRANSITIONAL PROGRAM.—

(1) ESTABLISHMENT.— Not later than the date that is 1 year after the date of the enactment of this Act, the Director shall issue regulations establishing and implementing a transitional post-grant review proceeding for review of the validity of covered business method patents.  The transitional proceeding implemented pursuant to this subsection shall be regarded as, and shall employ the standards and procedures of, a post-grant review under chapter 32 of title 35, United States Code, subject to the following:

(A)  Section 321(c) of title 35, United States Code, and subsections (b), (e)(2), and (f) of section 325 of such title shall not apply to a transitional proceeding.

(B)  A person may not file a petition for a transitional proceeding with respect to a covered business method patent unless the person or the person's real party in interest or privy has been sued for infringement of the patent or has been charged with infringement under that patent.

(C)  A petitioner in a transitional proceeding who challenges the validity of 1 or more claims in a covered business method patent on a ground raised under section 102 or 103 of title 35, United States Code, as in effect on the day before the effective date set forth in section 3(n)(1), may support such ground only on the basis of—

(i)  prior art that is described by section 102(a) of such title of such title (as in effect on the day before such effective date); or

(ii)  prior art that—

(I)  discloses the invention more than 1 year before the date of the application for patent in the United States; and

(II) would be described by section 102(a) of such title (as in effect on the day before the effective date set forth in section 3(n)(1)) if the disclosure had been made by another before the invention thereof by the applicant for patent.

(D)  The petitioner in a transitional proceeding that results in a final written decision under section 328(a) of title 35, United States Code, with respect to a claim in a covered business method patent, or the petitioner's real party in interest, may not assert, either in a civil action arising in whole or in part under section 1338 of title 28, United States Code, or in a proceeding before the International Trade Commission under section 337 of the Tariff Act of 1930 (19 U.S.C. 1337), that the claim is invalid on any ground that the petitioner raised during that transitional proceeding.

(E)  The Director may institute a transitional proceeding only for a patent that is a covered business method patent.

(2) EFFECTIVE DATE.—The regulations issued under paragraph (1) shall take effect upon the expiration of the 1-year period beginning on the date of the enactment of this Act and shall apply to any covered business method patent issued before, on, or after that effective date, except that the regulations shall not apply to a patent described in section 6(f)(2)(A) of this Act during the period in which a petition for post-grant review of that patent would satisfy the requirements of section 321(c) of title 35, United States Code.

(3) SUNSET.—

(A)  IN GENERAL.—This subsection, and the regulations issued under this subsection, are repealed effective upon the expiration of the 8-year period beginning on the date that the regulations issued under to paragraph (1) take effect.

(B)  APPLICABILITY.—Notwithstanding subparagraph (A), this subsection and the regulations issued under this subsection shall continue to apply, after the date of the repeal under subparagraph (A), to any petition for a transitional proceeding that is filed before the date of such repeal.

(b) REQUEST FOR STAY.—

(1) IN GENERAL.—If a party seeks a stay of a civil action alleging infringement of a patent under section 281 of title 35, United States Code, relating to a transitional proceeding for that patent, the court shall decide whether to enter a stay based on—

(A)  whether a stay, or the denial thereof, will simplify the issues in question and streamline the trial;

(B)  whether discovery is complete and whether a trial date has been set;

(C)  whether a stay, or the denial thereof, would unduly prejudice the nonmoving party or present a clear tactical advantage for the moving party; and

(D)  whether a stay, or the denial thereof, will reduce the burden of litigation on the parties and on the court.

(2) REVIEW.—A party may take an immediate interlocutory appeal from a district court's decision under paragraph (1).  The United States Court of Appeals for the Federal Circuit shall review the district court's decision to ensure consistent application of established precedent, and such review may be de novo.

\* \* \*